**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

DERRICK JEROME BATES,

        Plaintiff,

vs.

TYLER RICHARDSON and WAYNE
JERMAN, *in their individual and official
capacities* and the CITY OF CEDAR
RAPIDS, IOWA,

        Defendants.

No. 18-CV-30 CJW-MAR

**ORDER**

_____

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................ 2

II.    PLAINTIFF'S CLAIMS AND PROCEDURAL HISTORY ........................ 7

III.   SUMMARY JUDGMENT STANDARD ............................................... 9

IV.   DISCUSSION ............................................................................. 11

     A.    Lawfulness of Arrest for Interference with Official Acts ................... 12

     B.    Qualified Immunity as to Officer Richardson ............................... 18

     C.    Iowa Common Law False Arrest Claim ...................................... 21

     D.    Liability of Chief Jerman and the City under Section 1983 ................ 22

          1.    Chief Jerman in His Individual Capacity .............................. 23

          2.    Chief Jerman in His Official Capacity and the City ................. 23

V.     CONCLUSION ............................................................................ 26

This matter is before the Court on defendants' Second Motion for Summary Judgment. (Doc. 68). Defendants incorporated a statement of material facts identical to that filed in their initial motion for summary judgment. (Doc. 68-2). Plaintiff timely filed a brief in resistance. (Doc. 70). Plaintiff incorporated his initial response to defendants' statement of material facts. (Doc. 44). Defendants timely filed a brief in reply to plaintiff's resistance. (Doc. 71). For the reasons that follow, the Court **grants** defendants' Second Motion for Summary Judgment.

## I. BACKGROUND

On April 24, 2016, at approximately 3:21 P.M., Cedar Rapids, Iowa police officers responded to a 911 report of a disturbance. (Doc. 41-2, at 2). The dispatcher informed the officers that "3 black males that live in corner house by al[le]y are outside arguing" and "one displayed a handgun." (Doc. 41-3, at 33, 57). The location of the incident was described as "Higley Ave SE/ Wellington St SE." (Doc. 41-3, at 57).

Cedar Rapids Police Officer Tyler Richardson was the first officer to arrive near the scene. On the way, Officer Richardson activated his emergency lights and siren, but turned them off within a block of arriving at the location.[1] Dashcam footage from Officer Richardson's squad car shows that as he neared the corner of Higley Avenue and Wellington Street, he stopped to speak with a woman who flagged him down. The woman told Officer Richardson that one of the males involved in the alleged gun disturbance went around the corner—presumably the corner at Higley Avenue and Wellington

---

[1] Defendants assert that "[a]nyone outside at the location of the disturbance would have been able to hear his siren." (Doc. 41-1, at 4). That may be true, but there is no evidence in the record that plaintiff or Irvin heard the siren. The Court will not speculate, then, that either of them in fact heard the police siren. Even if they had heard the siren, there is no basis in the record to conclude that they had reason to believe it had anything to do with them.

Street—and was wearing either white and black clothing or white and blue clothing.[2] Officer Richardson then continued driving along Higley Avenue and turned right onto Wellington Street. As Officer Richardson turned onto Wellington Street, two males walking along the left side of Wellington Street came into view. The video shows one male—later identified as plaintiff—wearing a red shirt and dark pants and shows the other male—later identified as Lorenzo Irvin—wearing dark clothing. The males were walking in the opposite direction, away from the direction of Officer Richardson's approach.

Officer Richardson stopped his vehicle, got out, and called out "Stop. Stop." The males turned their heads in response to Officer Richardson but kept walking. Officer Richardson then yelled "Yeah, you guys." The two males then initially stopped and turned toward Officer Richardson, at which point the video shows that plaintiff's pants had a white stripe down the side and that Irvin's shirt had a white stripe down the right arm. Plaintiff replied "no, we didn't do nothing" and gestured toward Officer Richardson with his hand, as if waving him off. Plaintiff and Irvin then turned and continued walking away from Officer Richardson and toward an intersection. Plaintiff and Irvin began turning left at the intersection down the next street. A fence and a tree began to partially block plaintiff and Irvin from Officer Richardson's view as the pair turned left at the intersection.

Once plaintiff and Irvin began walking away from Officer Richardson after having paused, Officer Richardson began unholstering his gun and continued shouting commands for plaintiff and Irvin "stop right now, stop" and repeatedly commanded them to get on the ground. Plaintiff and Irvin continued to walk a few steps more. As Officer Richardson was shouting commands to stop, Officer Jared Jupin's squad car, which had

---

[2] The woman might have said blue pants, but the end of her statement is hard to hear on the audiotape.

Case 1:18-cv-00030-CJW-MAR   Document 72   Filed 07/25/22   Page 3 of 26

approached the scene from the opposite direction, came into view of Officer Richardson's dashcam. By the time Officer Jupin got out of his car, Officer Richardson had unholstered his gun and had it in hand, all the while walking toward plaintiff and Irvin, who were still walking away from the officers despite Officer Richardson's repeated commands to stop. Officer Jupin unholstered his weapon as well, and the two officers began closing in on plaintiff and Irvin while they continued to shout commands for plaintiff and Irvin to get on the ground.

Plaintiff and Irvin turned left at the intersection and disappeared from the view of Officer Richardson's dashcam. Officer Jupin's squad car, however, was positioned such that his dashcam captured the events that transpired following Officer Jupin's arrival on the scene.

The following facts are taken from the recording of events that were captured by Officer Jupin's dashcam. Officer Jupin left his car and began walking in front of his car, within the camera frame. As Officer Jupin did so, Officer Richardson repeatedly yelled "Get on the ground! Get on the ground now!" Plaintiff and Irvin, although no longer walking, did not immediately get on the ground. Eventually, the two males kneeled on the ground and once they were kneeling, a male voice shouted, "Face down!," "Get on the ground now!," "Face down right now!," and "All the way down!" Plaintiff and Irvin did not immediately get on the ground, and the commands for plaintiff and Irvin to lay "Face down!" and to "Get on the ground now!" were repeated until plaintiff and Irvin finally laid on the ground face down.

Once both males were handcuffed, Officer Richardson ran back to his squad car and drove down the street in pursuit of a black male wearing a white shirt that Officer Richardson had spotted walking down the street a block or so away. Officer Richardson stopped his car, got out, and called to that male to stop. The male stopped. Officer Richardson instructed the male to put his hands on a stone wall next to the sidewalk. The

4

male complied. Officer Richardson then approached the male and performed a pat down search. Finding no weapon, Officer Richardson told the male he could stand up and turn around. Officer Richardson then spoke with the male to determine whether he was involved in the disturbance with the firearm. In his interactions with the male in the white shirt, Officer Richardson did not draw his firearm or handcuff the male.

Meanwhile, Officer Jupin remained alone with plaintiff and Irvin. Irvin remained quiet and made only minor movements. Plaintiff, even with his hands cuffed behind his back, shouted and moved about almost the entire time Officer Jupin was alone with the males. At some point, Officers Heidi Northland and Michael Kern arrived at the scene where Officer Jupin was supervising plaintiff and Irvin. Eventually, the officers assisted Irvin in moving into seated (and eventually a standing) position. Plaintiff refused the officers' assistance and managed to move himself into a seated position.

After officers unhandcuffed and released them, both plaintiff and Irvin chose to remain at the scene and continued to move freely and converse with each other, a third bystander, and the officers. Plaintiff remained on the scene for approximately fifteen minutes and then walked back toward his apartment. At that point Officers Richardson, Jupin and Northland again approached plaintiff and told him to stop. Plaintiff complied. Officer Richardson then placed plaintiff under arrest for Interference with Official Acts, in violation of Iowa Code Section 719.1(1). Officer Richardson testified in a deposition that he believed he had probable cause to also arrest Irvin, a minor, for Interference with Official Acts, but exercised his discretion not to do so. (Doc. 44-2, at 47). Officer Richardson stated that he made the decision to arrest plaintiff based solely on plaintiff's refusal to obey Officer Richardson's orders. (Doc. 41-3, at 5; Doc. 44-2, at 18). The complaint reflects that plaintiff was charged with Interference with Official Acts for "refusing to stop when instructed." (Doc. 44-2, at 11). The officers took plaintiff to jail

and the following morning plaintiff was taken to the courthouse for his initial appearance. He was then released, however, and told that the charge had been dropped.

Plaintiff asserts that Officer Jupin "indicat[ed] in his report" that Officer Richardson arrested plaintiff because of plaintiff's actions and "due to comments[ ] he made when detained." (Doc. 44-1, at 8). This is supported by the record. Officer Jupin's report contains the following statement: "After they had been released Officer Richardson reached me over the radio and stated that he would be pursuing charges for Interference with Official Acts on Bates due to the comments he made when Officer Richardson was ordering him to stop and get on the ground." (Doc. 44-2, at 16).

Plaintiff also asserts that Officer Richardson "was admonished by the Linn County Attorney that a person cannot be charged with a crime for comments they make, no matter how offensive." (*Id.*). This assertion is not supported by the record. In support of this assertion plaintiff cites to his appendix at pages 27-38 and specifically to Officer Jupin's deposition at pages 59-60 and 68. (*Id.*). Plaintiff's appendix at pages 27-38 contains excerpts from Officer Jupin's deposition. They do not, however, include pages 59-60. Page 36 contains pages 53 through 56 of the deposition transcript and page 37 contains pages 65 through 68 of the deposition. Pages 66 through 68 contain a discussion about a disposition report written after a declination of prosecution by the county attorney, but nothing in these pages support plaintiff's assertion of facts. The Court could find nothing in the summary judgment record that establishes why the county attorney declined to prosecute, nor anything regarding a reprimand of Officer Richardson over his charging decision.

6

Plaintiff filed a personnel complaint regarding the April 24, 2016 incident. (41-3, at 35-37). Captain Craig Furnish,[3] as head of the Professional Standards Unit, was tasked with investigating plaintiff's complaints. (*Id.*, at 32). In connection with plaintiff's complaint, Captain Furnish interviewed plaintiff, two private citizens who witnessed at least part of the April 24, 2016 incident, and each of the five Cedar Rapids Police Department personnel who were present for at least a portion of the incident. (*Id.*). Captain Furnish also viewed the dashcam footage of the incident. (*Id.*, at 33). In investigating plaintiff's complaint, Captain Furnish reviewed the investigation that he had conducted into plaintiff's complaint, and also interviewed Irvin. (*Id.*).

## II. PLAINTIFF'S CLAIMS AND PROCEDURAL HISTORY

Plaintiff brought a five-count complaint in this Court. (*See* Doc. 28). Count One, which was brought against all defendants, was brought under Title 42, United States Code, Section 1983, and alleged that defendants violated plaintiff's rights to be free from illegal searches and seizures, to remain silent, and "to due process and equal protection of the law, including the right to be free from arrest without probable cause or to be the subject of custodial interrogation without *Miranda*[-]styled warnings." (*Id.*, at 9-13). Count Two asserted a state law false arrest and conspiracy claim against defendants Richardson, Northland, Jupin and Kern, and against the City of Cedar Rapids on a *respondeat superior* theory. (*Id.*, at 13-14). Count Three asserted a state law Malicious Prosecution claim against defendants Richardson, Northland, Jupin, and Kern, and against the City of Cedar Rapids on a *respondeat superior* theory. (*Id.*, at 14-15). Count Four asserted a state law perjury claim against defendants Richardson, Northland, Jupin, and Kern, and against the City of Cedar Rapids on a *respondeat superior* theory. (*Id.*,

---

[3] Captain Furnish was recently promoted to the rank of Police Captain. (*See* Doc. 41-3, at 31). At the time Captain Furnish investigated the April 24, 2016 incident, he held the rank of Lieutenant. (*Id.*).

at 15-16). Count Five asserted a state law false reports claim against defendants Richardson, Northland, Jupin, and Kern, and against the City of Cedar Rapids on a *respondeat superior* theory. (*Id.*, at 16-17).

The Court dismissed with prejudice the claims against defendants Kern and Northland, in their individual and official capacities, the claims against Officer Jupin, and Counts Three through Five, at plaintiff's concession. (Doc. 49, at 10, 31). Plaintiff maintained "that he was wrongfully arrested, searched and detained in violation of the Fourth Amendment to the United States Constitution and briefed those claims." (*Id.*). Plaintiff made those claims in Count One of his complaint. In Count Two of his complaint, plaintiff continued to "assert[ ] a claim for false arrest under Iowa law when he was detained and handcuffed against his will without justification or probable cause" and plaintiff fully briefed that claim. (Doc. 44-1, at 12-13). The Court addressed defendants' motion for summary judgment as to the claims in Counts One and Two of plaintiff's complaint as to defendants Richardson, Jupin, Cedar Rapids Police Chief Wayne Jerman, and the City of Cedar Rapids. After consideration, the Court granted defendants' motion for summary judgment on Counts One and Two. (Doc. 49, at 40). Plaintiff appealed to the Eighth Circuit Court of Appeals. (Doc. 51).

The Eighth Circuit affirmed in part and reversed in part. (Doc. 55, at 14). The Court of Appeals agreed "that the officers had reasonable suspicion—at a minimum arguable reasonable suspicion—and therefore are entitled to qualified immunity" as to the initial stop. (Doc. 55, at 8). The Court of Appeals also agreed that the *Terry* stop did not evolve into an arrest and affirmed the "grant of qualified immunity dismissing these Fourth Amendment claims." (Doc. 55, at 10). The Court of Appeals found that there were genuine issues of material fact, however, as to whether Officer Richardson had probable cause to arrest plaintiff for interference with official acts. (Doc. 55, at 11). The Court of Appeals thus reversed and remanded the state false arrest claim and Section

1983 false arrest claim. The Court of Appeals did not consider Iowa statutory immunities. (*Id.*, at 11). The Court of Appeals also reversed and remanded the dismissal of the *Monell* claims against Chief Jerman and the City attached to the false arrest claims finding that the Court's "reasoning no longer applies" given the reversal of the false arrest claims and that Chief Jerman's liability for Officer Richardson's actions is a "fact intensive" issue. (Doc. 55, at 13). Thus, the matters on remand are whether Officer Richardson's arrest of plaintiff was unlawful; if so, whether Officer Richardson is entitled to qualified or statutory immunity; and whether Chief Jerman and the City of Cedar Rapids are liable under theories of failure to train and/or supervise and/or implementation of policy, practice, custom, or procedure that led to the alleged violation.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v.*

*Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them" (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or

attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). "Rather, the court's function is to determine whether a dispute about a material fact is genuine . . . ." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

When a motion for summary judgment on a Section 1983 claim rests on the assertion of qualified immunity, summary judgment is appropriate only if the Court finds 1) there are no genuine issues of material fact that would counter the qualified immunity defense, and 2) summary judgment on the issue of qualified immunity is proper as a matter of law. *Johnson v. Jones*, 515 U.S. 304, 313-14 (1995) (suggesting that, had the movant been entitled to summary judgment as a matter of law, summary judgment on the qualified immunity defense would have been proper in the absence of a genuine issue of material fact). Thus, it can be said that when the defense of qualified immunity is raised, the movant need not prove the absence of *any* material fact, but need only prove the absence of any material fact relating to *the defense of qualified immunity*. If a dispute exists as to any material fact not pertaining to qualified immunity, but there are no disputes of material fact on the qualified immunity issue, summary judgment on the qualified immunity issue will be proper if the movant is so entitled as a matter of law. In keeping with the traditional summary judgment standard, all inferences of fact must be drawn in favor of the non-moving party. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).

## IV.    DISCUSSION

In Count One of his Complaint, plaintiff asserts claims under Title 42, United States Code, Section 1983, which recognizes violations of federal statutory or constitutional law "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his

responsibilities pursuant to state law." *Id.* at 50 (citations omitted). Section 1983 does not provide a means by which a plaintiff can seek redress for violations of state law. *See Baker v. McCollan*, 443 U.S. 137, 146 (1979). Plaintiff's surviving federal claim in Count One stems from plaintiff's arrest for Interference with Official Acts. Plaintiff argues that Officer Richardson directly violated his rights by arresting him without probable cause. Plaintiff further asserts that the City of Cedar Rapids is liable because it adopted a policy, practice, custom, or procedure that led to the violation. Plaintiff also alleges that Police Chief Wayne Jerman is liable because he implemented the policy, practice, custom, or procedure. Finally, plaintiff alleges that the City of Cedar Rapids, through its policymakers, including Chief Jerman, failed to train and/or supervise officers regarding lawful arrest procedures. In Count Two of his complaint, plaintiff alleges that Officer Richardson violated Iowa state law by falsely arresting him for interference with official acts. Plaintiff further asserts the City of Cedar Rapids is liable for Officer Richardson's alleged false arrest under a *respondeat superior* theory.

### A. Lawfulness of Arrest for Interference with Official Acts

Iowa Code Section 719.1, Interference with official acts, provides:

> A person commits interference with official acts when the person knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer. . .
> . . . .
> The terms "resist" and "obstruct" as used in this section, do not include verbal harassment unless the verbal harassment is accompanied by a present ability and apparent intention to execute a verbal threat physically.

The question at hand is whether plaintiff's conduct under the circumstances presented Officer Richardson with probable cause to arrest plaintiff under the statute. In its opinion, the Eighth Circuit Court of Appeals cited *Lewis*, *Smithson*, and *Sullivan* in support of its finding that there existed genuine issues of material facts as to the lawfulness of plaintiff's

arrest for interference with official acts. (Doc. 55, at 11). The Iowa Supreme Court, however, issued an opinion on the statute in question in January 2022, after the Eighth Circuit's opinion, that defendants contend clarifies the law in their favor. (Doc. 68-1, at 4); *see State v. Wilson*, 968 N.W.2d 903 (Iowa 2022). The *Wilson* court stated "that the standard for establishing a violation of the interference with official acts statute is generally fairly low." 968 N.W.2d at 918. The *Wilson* court also endorsed that "[t]he key question is whether the officer's actions were hindered." *Id.* (quoting *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1107 (8th Cir. 2004)).

Reading *Lewis*, *Smithson*, and *Sullivan* consistently with *Wilson* allows for a clearer assessment of Iowa Code Section 719.1 than was available to either this Court or the Eighth Circuit Court of Appeals in their respective prior opinions. In *Lewis*, the owner of plaintiff's property notified the police by letter that people were trespassing and loitering in the area. *State v. Lewis*, 675 N.W.2d 516, 519 (Iowa 2004). Later, officers on a routine patrol saw several people in the backyard of plaintiff's property. *Id.* at 520. The officers pulled into the driveway in a marked police car. *Id.* Two individuals saw the car and walked quickly towards the rear porch of the house. *Id.* The officers said "stop, police," the individuals did not stop, and the officers entered the enclosed backyard to pursue them. *Id.* The officers argued the individuals interfered with official acts by not stopping, and therefore they had probable cause to enter the property and pursue the individuals. *Id.* at 524. The court found that the officers did not have probable cause on a theory of interference with official acts. *Id.* at 526.

*Lewis*, read without the context of *Wilson*, plausibly asserts that the act of merely walking away and ignoring commands is insufficient to establish interference with official acts. *See Lewis*, 675 N.W.2d at 526 ("The mere act of quickly walking away from the officer and ignoring his directions to stop under these circumstances is not interference with official acts."). Read consistently with *Wilson*, however, the circumstances present

in *Lewis* clearly play a substantial role in the court's opinion. The *Lewis* court distinguished its case from two cases in which the plaintiffs failed to stop for traffic violations on public roads and were pursued and then arrested on private property. *Id.* at 526. Although part of the court's contrast analysis focused on the more extensive interference in the traffic cases, a substantial point of the court's distinction was that the officers in *Lewis* did not have probable cause to infringe on the individuals' privacy in the first place. *Id.*[4] Indeed, this point of distinction seems to have been critical in the court's reasoning:

> We are not saying police should not investigate situations they find suspicious. But here, the officers did not have to enter Lewis's backyard to investigate the crime of trespass. The officers could have first approached the front door and either rang the doorbell or knocked, in an attempt to contact Lewis to ask him if the individuals were on his premises with his permission. If the officer had attempted to contact Lewis at his front door and received no response, the invasion of the curtilage may not have violated Lewis's Fourth Amendment rights.

*Id.* at 526-27, citing *State v. Breuer*, 577 N.W.2d 41, 50 (Iowa 1998). Important to the *Lewis* court's holding, then, is that the officers' actions were not actually hindered by the individuals' acts because the officers had lawful alternatives by which to continue their investigation that they did not pursue. The blanket statement "that a single instance of mere failure to cooperate cannot serve as the basis for a charge of interference with official acts[,]" while plausible before the guidance of *Wilson*, is now inaccurate given that *Lewis* depended heavily on the specific circumstances of that case.

*Smithson*, too, depended on specific circumstances. In *Smithson*, Des Moines police received a noise complaint about the defendant's club. *State v. Smithson*, 594

---

[4] The *Lewis* court noted in the traffic cases "the officers observed activities taking place on public roadways, which gave them probable cause to believe a crime had been committed." *Lewis*, 675 N.W.2d at 526. The Court contrasted this with Lewis' case where it found "these individuals were free to go about their business on Lewis's property without police interference." *Id.*

N.W.2d 1 (Iowa 1999). An officer entered and spoke to the defendant, the owner and manager, and requested that he turn down the volume of the music. *Id.* The defendant ignored the request. *Id.* The officer charged the defendant with interference with official acts for "not turning down the music at the officer's request." *Id.* at 2. The court held that defendant's failure to turn down the music could not support a guilty verdict under interference with official acts. *Id.* at 3. *Smithson* differs from *Lewis* and the present case because Smithson failed to cooperate with a request rather than a command and did so passively rather than actively. *Smithson* is also distinguishable because it addressed the evidence necessary to sustain a conviction for interference with official acts rather than evidence necessary to establish probable cause for arrest for interference with official acts. Furthermore, "[t]he purpose of criminalizing conduct that interferes with official police action is to enable officers to execute their peace-keeping duties calmly, efficiently, and without hindrance." *State v. Buchanan*, 549 N.W.2d 291, 294 (Iowa 1996) (citing *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct. App. 1984)). It is implausible that passive failure to fulfill a request to turn down music is conduct the statute meant to criminalize because it did not interfere with officers' ability to carry out their duties. Thus, this narrower interpretation of *Smithson* is more appropriate than the broader interpretation of the *Sullivan* court's opinion given *Wilson*'s guidance and the more accurate interpretation of *Lewis*.

Sullivan can also be read consistently with *Wilson* despite its erroneous assessment of *Smithson* and *Lewis*. In *Sullivan*, the Dubuque County Sheriff's Department attempted to serve a defendant with notice of a lawsuit 29 times in under a month. *State v. Sullivan*, No. 08-0541, 2009 WL 250287, at *1 (Iowa Ct. App. Feb. 4, 2009). An officer called the defendant to notify him and ask that the defendant pick up official papers. *Id.* The defendant agreed, prompting the department to "set aside the task," but he did not follow through. *Id.* The department continued to attempt to serve the defendant, but the

defendant failed to contact the department when requested and did not answer his door when a deputy knocked. *Id.* The defendant was later located and "admitted he had been attempting to avoid the service of process." *Id.* The defendant was arrested for interfering with official acts. The *Sullivan* court found that "failure to answer one's own door [does not] constitute[ ] the type of 'active interference' contemplated by the statute." *Id.*, at *4. The holding of *Sullivan*, however, did not depend on whether "a single instance of mere failure to cooperate" can or cannot support "a charge of interference with official acts." *Id.* The case was decided, rather, on Sullivan's evasion of law enforcement that constituted "putting obstacles in the path of officers completing their duties." *Id.* (quoting *Hauan*, 361 N.W.2d at 339). The actual holding that Sullivan's evasion hindered law enforcement and therefore supported a charge of interference with official acts is thus consistent with *Wilson*, despite the court's extraneous analysis of *Smithson* and *Lewis*.

The question here, then, is whether Officer Richardson had probable cause to believe that plaintiff hindered Officer Richardson in executing his official duties. The Court finds that he did. It is not enough to rely, as plaintiff does, on the theory "that a single instance of mere failure to cooperate cannot serve as the basis for a charge of interference with official acts" in light of *Wilson*. This case depends on its circumstances as much as *Lewis*, *Smithson*, and *Sullivan*.

Here, Officer Richardson was investigating a report of men in a dispute, one of whom had a firearm. Public safety was at stake and identifying the suspects was time-critical. Officer Richardson encountered plaintiff and another man that this Court found, and the Eighth Circuit agreed, reasonably could have answered to the description of the suspects. Unlike the officer in *Smithson*, Officer Richardson clearly gave an order to plaintiff to stop. Officer Richardson's initial words "stop, stop" were almost certainly an order. Even if, however, the initial words "stop, stop" are viewed as a request, when

plaintiff continued to walk away Officer Richardson subsequently yelled "Stop, right now! Stop!" Such language undoubtedly constitutes a command in the eyes of the Court. After this command, plaintiff continued to take a few more steps and also did not immediately get on the ground as he was repeatedly ordered to do. Importantly, plaintiff acknowledged Officer Richardson's presence, Officer Richardson was in uniform and standing next to his marked police car, Officer Richardson confirmed he was addressing plaintiff, and plaintiff verbally and physically refused to comply. This conduct goes beyond passive failure to comply and instead is clearly active defiance, further distinguishing plaintiff's actions from Smithson's.

This case is also distinguishable from *Lewis*. Officer Richardson's stopping of plaintiff was lawful. (Doc 55, at 8). Because this charge arose from plaintiff's response to lawful and appropriate actions by Officer Richardson, the circumstances that precluded hinderance in *Lewis* are not present here. Plaintiff's conduct in response to Officer Richardson's lawful direction is more similar to that in *Sullivan*. Plaintiff knew he was the subject of an official act, as Sullivan knew. Plaintiff actively defied compliance with this official act, as Sullivan did. Plaintiff's active defiance delayed the officers' investigation of the reported disturbance involving a firearm, as Sullivan delayed the sheriff's serving of notice. Plaintiff's conduct "put[ ] obstacles in the path of officers completing their duties[ ]" and thus plaintiff actually hindered and delayed Officer Richardson's actions in trying to identify and deal with men who potentially posed a danger to the community.

The clearest indication of this hindrance is seen in contrasting Officer Richardson's stop of plaintiff with that of the third male. The interactions began essentially identically—Officer Richardson pulled his vehicle up from behind, got out, and said "stop." Because the third male complied, however, Officer Richardson did not have to unholster his firearm, he did not have to command the third male to get on the ground,

he did not have to detain the third male, and he was able to calmly, efficiently, and quickly gather information to further the investigation. Plaintiff's active refusal to comply with orders, on the other hand, forced Officer Richardson's peace-keeping duties to be executed in a way that was chaotic, more dangerous than necessary, inefficient, delayed, and, generally, substantially hindered. But for plaintiff's active refusal, Officer Richardson would not have had to unholster his firearm, Officers Richardson and Jupin would not have had to expend substantial effort and critical time to detain plaintiff, and the officers would have been able to pursue their investigation more quickly and more effectively. Plaintiff's active disobedience actually and obviously hindered Officer Richardson's actions, both absolutely and relative to the stop of the third male. Thus, in accordance with *Wilson*, Officer Richardson had probable cause to arrest plaintiff for interference with official acts making the arrest lawful.

### B. *Qualified Immunity as to Officer Richardson*

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The success of a qualified immunity defense depends on two determinations. "[A] court must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Also, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id*. The factors can be considered in either order. *Id*. at 236. If the facts that the plaintiff has alleged make out a violation of a constitutional right and the right at issue was clearly established at the time of the defendant's alleged misconduct, then the defense fails. Otherwise, the defense must be successful. This Court has already determined that the

facts here do not make out a violation of a constitutional right because Officer Richardson had probable cause to arrest plaintiff. Even if, however, Officer Richardson did violate plaintiff's constitutional right, that right was not so clearly established as to defeat qualified immunity here.

That a law or right is well established generally does not meet the standard required to defeat qualified immunity. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). "[T]he governing standard for a Fourth Amendment unlawful arrest claim is not probable cause in fact but arguable probable cause . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). "In the wrongful arrest context, officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable." *Id.* (quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010)). Further, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

The Eighth Circuit noted (Doc. 55, at 12) and plaintiff emphasized (Doc. 70, at 8) *Small v. McCrystal*, 708 F.3d 997 (8th Cir. 2013), as an instance of denying qualified immunity for an arrest for interference with official acts while the plaintiff was walking away from the officers. In *McCrystal*, officers responded to a reported disturbance at a clubhouse. *Small v. McCrystal*, No. 10–CV–04088–DEO, 2012 WL 1134013, at *1 (N.D. Iowa April 4, 2012). The facts beyond that were unclear, and testimony conflicted

19

as to key events.[5]   The plaintiff claimed there were only 30 to 50 people gathered peacefully.   The defendant claimed there were 150 to 200 people acting violently.   The plaintiff claimed he had no interaction with officers in the clubhouse.   The defendant claimed the plaintiff was screaming at and berating him.   The plaintiff claimed he was walking away from the clubhouse quietly when he was tackled from behind.   The defendant claimed the officers told the plaintiff to leave, the plaintiff refused, and then the plaintiff resisted arrest, prompting the officers to "execute[ ] a take-down."

*McCrystal* is distinct from this case in every way but that an officer is claiming qualified immunity in relation to an arrest for interference with official acts.   The *McCrystal* trial court was presented with a factual mess.   The plaintiff had fairly substantial evidence to support his factual claims and inferences on each point could be easily drawn in his favor.   Because of this, the trial court found that a reasonable jury could conclude that the officer's actions were clearly unlawful.   *Id.* at *8 (N.D. Iowa April 4, 2012).   Those significant factual disputes do not exist here.   In *McCrystal*, viewing the facts most favorably to the plaintiff resulted in a narrative of a man quietly walking to his trailer being tackled by police from behind with no warning.   That narrative does not allow for a reasonable officer to interpret the plaintiff's actions as hindering officers, putting obstacles in their paths, or otherwise obstructing or resisting them in the course of official acts.

Interpreting the facts in plaintiff's favor here, on the other hand, is not nearly as restrictive.   The dashcam footage shows Officer Richardson making his presence known to plaintiff, telling plaintiff to stop multiple times, and plaintiff repeatedly refusing to do so.   Critical   factors   that   may   not   have   existed   in   *McCrystal*—justification,

---

[5] The plaintiff's claims are described in *Small v. McCrystal*, 708 F.3d 997, 1002 (8th Cir. 2013). The defendant's claims are described in *Small v. McCrystal*, No. 10–CV–04088–DEO, 2012 WL 1134013, at *1-2 (N.D. Iowa April 4, 2012).

acknowledgement, warning, instruction, and refusal—are all plainly apparent from the video footage here. An officer in Officer Richardson's shoes would have been called to investigate a potentially dangerous incident involving at least one man with a gun. This officer would have been told that one of the suspects was right around the corner and then would have seen two males, and no one else, around that corner. One of those males then would have verbally and physically refused to follow an instruction to stop and the officer would likely have felt the need to draw his weapon to prevent potential danger and detain the suspects. The officer then would have been presented with a situation in which a suspect did not refuse to stop, and the officer would have found he was able to carry out his duties calmly and effectively without risking harm to the community. The Court will not say that this officer would be objectively unreasonable in believing he had probable cause to arrest the noncompliant suspect for interference with official acts, even if he legally did not. This officer would not be "plainly incompetent" and presumably would not have "knowingly violate[d] the law." And the question of lawfulness, particularly in light of *Wilson* and the resulting more accurate interpretations of *Lewis*, *Smithson*, and *Sullivan*, had not been "placed . . . beyond debate" by existing precedent. Because the officer would have been reasonable in arresting plaintiff under these circumstances, plaintiff's right to not be arrested for his conduct was not clearly established. At most, Officer Richardson made a bad guess in a gray area; he did not transgress a bright line. Thus, the defense must be successful, and Officer Richardson is entitled to qualified immunity.

### C. Iowa Common Law False Arrest Claim

Under Iowa law, a false arrest claim "has two elements: '(1) detention or restraint against one's will, and (2) unlawfulness of the detention or restraint.'" *Davis v. Dawson*, 33 F.4th 993, 1001 (8th Cir. 2022) (quoting *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002)). The Court will assume, for purposes of the current motion only,

that plaintiff was detained or restrained against his will, and the Court will proceed to the second element of plaintiff's false arrest claim. The Court determined above that Officer Richardson did have probable cause to arrest plaintiff, and so the arrest was lawful. Even if Officer Richardson did not have probable cause to the extent necessary to outright establish lawfulness of the arrest, the false arrest claim still fails.

The Iowa Supreme Court has established the standard of probable cause that governs civil actions for false arrest:

> [T]o justify a warrantless arrest for a crime not committed in his presence, a police officer must allege and prove 1) that he in good faith believed that the person arrested had committed the crime, and 2) that his belief was reasonable. *Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983). In considering these two matters, courts look to the facts within the officer's knowledge at the time the arrest was made. *Id.*

*Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984). "Probable cause . . . must be determined on the particular facts of each case. *Id.* at 470 (citing *Children*, 331 N.W.2d at 680). As the Court determined above, Officer Richardson did have a good-faith belief that plaintiff committed the crime of interference with official acts, and this belief was reasonable. Thus, even if plaintiff did not interfere with official acts, Officer Richardson's reasonable, good-faith belief that plaintiff did justifies the arrest.

Because Officer Richardson had probable cause to arrest plaintiff, and, if he did not, he had a reasonable, good-faith belief that he did, the arrest was lawful. Thus, plaintiff cannot establish the second element of a common law false arrest claim and so this claim cannot succeed against any defendant.

### D. Liability of Chief Jerman and the City under Section 1983

Because Officer Richardson had probable cause to arrest plaintiff for interference with official acts, he is not liable to plaintiff for any alleged damages. Alternatively, because Officer Richardson is entitled to qualified immunity if he did violate plaintiff's

constitutional rights, he is not liable for any alleged damages. Because Officer Richardson is not liable for any alleged damages, neither Chief Jerman nor the City of Cedar Rapids can be liable. In the interest of being thorough, the Court will address the liability of Chief Jerman, in his individual and official capacities, and the City were Officer Richardson actually liable.

### 1. Chief Jerman in His Individual Capacity

Chief Jerman was not present during plaintiff's arrest, so he could only be individually liable for any failure to supervise or train Officer Richardson under very limited circumstances. "'When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard' that requires personal knowledge of the constitutional risk posed by inadequate supervision." *S.M. v. Lincoln County*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 341 (8th Cir. 2015)). Plaintiff has provided no evidence that Chief Jerman failed to train or supervise Officer Richardson. Plaintiff has provided no evidence that Chief Jerman acted with indifference towards plaintiff's constitutional rights. Even if an unreasonable inference is made that a single instance of violation of rights is evidence itself of failure to train or supervise and indifference in doing so, there is no permissible inference that Chief Jerman subjectively understood that there existed a constitutional risk and acted or failed to act in spite of that. Thus, even if Chief Jerman failed in some way to supervise or train Officer Richardson, he would still be entitled to qualified immunity and would not be individually liable.

### 2. Chief Jerman in His Official Capacity and the City

The claims against Chief Jerman in his official capacity and those against the City are essentially one and the same, and therefore the Court addresses them together. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

"A municipality or other local government may be liable under [Section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing 42 U.S.C. 1983). "Plaintiffs who seek to impose liability on local governments under [Section] 1983 must prove that action pursuant to official municipal policy caused their injury." *Id.* at 60-61 (citation and internal quotation marks omitted). "There must be a causal connection between the municipal policy or custom and the alleged constitutional violation in order to state a valid claim under [Section] 1983." *Waters v. Madson*, 921 F.3d 725, 743 (8th Cir. 2019) (quoting *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013)). Official policies can include "the acts of . . . policymaking officials . . . and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. "These are actions for which the municipality is actually responsible." *Id.* (citation and internal quotation marks omitted). Further, if an authorized policymaker approves a subordinate's decision and the basis for that decision, the policymaker's "ratification would be chargeable to the municipality because [the policymaker's] decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "Generally, an isolated incident of alleged police misconduct . . . cannot, as a matter of law, establish a municipal policy or custom creating liability under [Section] 1983." *Ulrich*, 715 F.3d at 1061.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of [Section] 1983." *Connick*, 563 U.S. at 61. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (citation and internal quotation marks omitted). To establish municipal liability, "[t]here must at least be an affirmative link

between the training inadequacies alleged, and the particular constitutional violation at issue." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

Plaintiff has identified no evidence to indicate the City failed to train or to supervise Officer Richardson or any other employee on this issue. Further, plaintiff has identified no evidence to suggest the City was objectively deliberately indifferent to the rights of individuals with whom its employees come into contact, even if there were some failure to train or supervise. The only potential evidence plaintiff offers to support his claim that Officer Richardson was improperly trained or supervised is an inference from the alleged incident itself. (Doc. 44, at 10). Under *Ulrich*, this alone is insufficient to establish a policy or custom, and the Court sees nothing exceptional about the present case to warrant deviation from this standard. Similarly, plaintiff has not identified any evidence, apart from the alleged incident itself, to suggest that the City established or allowed a policy, custom, or practice that could have led to Officer Richardson's alleged violation.

Assuming Officer Richardson's arrest of plaintiff was unlawful, Chief Jerman's review of the incident and subsequent decision to not act upon it could be seen as ratification. However, even if Chief Jerman did ratify Officer Richardson's arrest of plaintiff, that alone is not sufficient to establish municipal liability. The City would only be liable for Chief Jerman's ratification if that ratification were the cause of the unlawful conduct. In *Waters*, the court found that a police chief's "after-the-fact determination" that officers acted lawfully, and the chief's subsequent closing of a complaint, could not establish the causation necessary to sustain a *Monell* claim. 921 F.3d at 743. Here, the same reasoning applies. Ratification by the proper official can constitute policy, and a municipality can be liable for actions taken under that policy, but Chief Jerman's alleged ratification of Officer Richardson's conduct necessarily occurred after that conduct had taken place. The alleged policy—the ratification—did not exist prior to or during Officer

Richardson's conduct, and so Officer Richardson could not have acted under it. Because Officer Richardson did not act under an existing policy or custom, and there is no evidence of failure to train or supervise, the causation element of municipal liability fails, and thus the City is not liable for the allegedly unlawful conduct.

## V.    CONCLUSION

For the reasons stated, the Court finds that Officer Richardson is entitled to judgment as a matter of law on the remaining Section 1983 claim; Officer Richardson and Chief Jerman, in their individual capacities, are entitled to qualified immunity on the Section 1983 claim; Chief Jerman, in his official capacity, and the City of Cedar Rapids are entitled to judgment as a matter of law on the Section 1983 claim; and all defendants are entitled to judgment as a matter of law on plaintiff's state law claims. When read together, the Court's findings amount to a complete grant of summary judgment as to all defendants. Thus, the Court **grants** defendants' Second Motion for Summary Judgment (Doc. 68) and this case is **dismissed with prejudice**.

**IT IS SO ORDERED** this 25th day of July, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa